Filed 11/6/23  P. v. Lawson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

|  |  |
|---|---|
| THE PEOPLE, | C094760 |
| Plaintiff and Respondent, | (Super. Ct. No. 19CF03236) |
| v. |  |
| WILLIAM DAVID LAWSON, JR., |  |
| Defendant and Appellant. |  |

Defendant William David Lawson, Jr., repeatedly sexually abused his stepdaughter, J.L., when she was between the ages of 12 and 18.  A jury found him guilty of numerous sex offenses, including two counts of aggravated sexual assault of a child under the age of 14 years--rape (Pen. Code, §§ 269, subd. (a)(1), 261, subd. (a)(2)),[1] two

---

[1]  Undesignated statutory references are to the Penal Code.

1

counts of aggravated sexual assault of a child under the age of 14 years--oral copulation (§§ 269, subd. (a)(4), 287, subd. (c)(2)(B)), one count of aggravated sexual assault of a child under the age of 14 years--sexual penetration (§§ 269, subd. (a)(5), 289, subd. (a)(1)(B)), three counts of forcible oral copulation of a minor over the age of 14 years (§ 287, subd. (c)(2)(C)), and seven counts of forcible rape of a minor over the age of 14 years (§ 261, subd. (a)(2)).  The jury also found true the special allegation that J.L. was a minor under the age of 18 years when the forcible rape counts were committed, and defendant knew or reasonably should have known she was under 18.  In a bifurcated proceeding, the trial court found that defendant had a prior serious felony conviction (§§ 667, subds. (a)(1), (d); 1170.12, subd. (b)) that qualified as a strike under the three strikes law (§§ 667, subds. (b)-(j), 1170.12, subd. (b)).  The court sentenced defendant to an aggregate term of 244 years to life in prison, with a minimum parole eligibility of 150 years.

Defendant appeals, arguing reversal is required due to instructional errors and sentencing error.  He also argues the matter must be remanded for resentencing in light of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567).  We will vacate defendant's sentence and remand the matter for a full resentencing given the change in law effected by Senate Bill No. 567.  In all other respects, we affirm the judgment.

**FACTUAL BACKGROUND**

We summarize the pertinent facts adduced at trial.  Additional information related to the contentions raised on appeal is set forth in the Discussion section, *post*.

*The Family*

J.L. was born in March 2001 and at the time of the trial was 20 years old.  She has three younger sisters and an older brother.  At all relevant times, J.L.'s family lived in Chico.

In 2004, defendant became J.L.'s stepfather; she was three years old and he was 28 or 29 years old. Defendant was the only father figure J.L. ever knew. J.L.'s mother was not a "very present mom"; she took pills and slept "a lot," including during the day. From a young age, J.L. took care of her sisters and was like a mother to them.

Defendant set the family rules and was the disciplinarian. He helped pay the bills and bought food and clothes for the children. He also took J.L. to school, gave her permission to do social things with her friends, and gave her money. J.L. did not obtain a driver's license at any point during the relevant period and depended on defendant to take her places she needed to go.

*The Sexual Abuse*

Defendant repeatedly sexually abused J.L. when she was between the ages of 12 and 18.

The abuse began during the summer before J.L. entered sixth grade. On a frequent basis, defendant went into J.L.'s room at night when she was in bed and rubbed her "butt and vagina area." He also inserted his finger into her vagina and/or put his mouth on her vagina. During these incidents, J.L. pretended to be asleep. Her mother was either sleeping or working.

When J.L was in sixth grade and 11 or 12 years old, defendant had sexual intercourse with her "[b]asically every day." Initially, J.L. pretended to be asleep when defendant came into her bedroom at night to engage in intercourse. However, because that did not deter defendant, she stopped. Instead, she would just "lay there" and not "really fight it," even though she did not want to have intercourse with defendant. At trial, J.L. recalled that she was worried about becoming pregnant when she was in the sixth grade. To accomplish the sexual acts that occurred in J.L.'s bedroom at night, defendant undressed J.L. and moved her around the bed and/or onto the floor.

When J.L. was in seventh or eighth grade, her family moved to a different home. Thereafter, the "frequency of [the] sexual intercourse picked up." When J.L. was between the ages of 13 and 15, defendant orally copulated and had sexual intercourse with her "[o]ften"; he "didn't go longer than two or three days without having intercourse" with J.L.

After J.L. turned 15 years old, defendant took her on "rides" to Little Chico Creek or empty parking lots to engage in sexual acts in the car. In exchange for doing things for J.L. (e.g., paying her phone bill), he would demand that she "go on a ride" with him and have sex in the car.

When J.L. was between the ages of 15 and 17, defendant took her to motels to have sexual intercourse. Defendant also orally copulated J.L. during this time period.

At trial, J.L. testified that she did not consent or willingly participate in sexual acts with defendant. J.L. explained that she "submit[ted]" to the acts because she felt like she had no choice and it was a "normal" part of her life; she felt frustrated, helpless, and trapped. J.L. further explained that if she refused defendant's sexual demands, he would be on edge and irritated the entire day; he would create a "whole bunch of chaos and havoc" in the house and yell at everyone. This made J.L. feel like it was her fault that defendant was yelling at her mother and/or sisters.

When asked, J.L. recalled an incident where defendant forced himself onto her after she refused to engage in sexual acts with him. During this incident, defendant ignored J.L.'s pleas to stop, even though she was crying. On another occasion, defendant got really mad and yelled and swore at J.L. when she told him "no." This made J.L. feel "pretty terrified." Both of these incidents occurred at some point after J.L.'s family moved in seventh or eighth grade.

*J.L.'s Boyfriends*

When J.L. was 15 years old and a freshman in high school, defendant put a "tracker" on her cell phone and would show up at her location on a regular basis.

4

Defendant told J.L. that the tracker allowed him to access her photographs, text messages, and call history.

At age 15 or 16, J.L. began dating her first boyfriend, A. Defendant, who was jealous of A., read the couple's text messages, would not allow them to get together, and followed them around town. On one occasion, he grabbed A.'s neck while J.L. was sitting on his lap at the farmer's market and told them they "shouldn't be doing that kind of stuff." On another occasion, defendant rented a room at a motel for J.L. and A. However, defendant told J.L. she could not use the room unless she agreed to engage in sexual intercourse with him.[2] Defendant set up a camera inside the hotel room, which captured J.L. having sexual intercourse with A, and later showed the video recording to J.L.

Shortly after J.L. turned 18 years old, she began dating J. Defendant, who was jealous of J., harassed and threatened him. He called J. from blocked phone numbers, followed his car, threatened to beat him up, and threatened to go to his house and speak with his family. Defendant called J. a racial slur, accused J.L. of using "random beds" to "fuck" J., and told J.L. she needed to get her "ass kicked" because she was "acting foul, doing nasty shit like [a] street girl." Defendant would regularly show up at J.L.'s location when she was with J., including when she and J. were alone together in J.'s car.

On two separate occasions, defendant pulled out a knife and "put it up to [J.'s] chest." During one of those incidents, defendant threatened to kill J. if he did not leave J.L. alone. On another occasion, defendant threatened J. while he was in the backseat of his car with J.L. Defendant opened the door and told J. that he was "going to grab his

---

[2] At trial, J.L. explained that defendant would often try to "make deals" with her to "get sexual intercourse." For example, he would pay her phone bill or give her permission to go to a friend's house if she had sex with him.

5

nine" (i.e., 9 mm handgun), and that J. was a "dead mother F'er."  Before leaving the area with J.L., defendant punched J. in the chest.

J. broke up with J.L. two or three times during a six-week period because of defendant's behavior.  At trial, J. explained that "there were multiple times where [he] felt like [his] life was put on the line and [he] couldn't do it anymore."

*Disclosure of the Sexual Abuse*

When J.L. was 12 or 13 years old, she told her cousin and best friend (A.B.) that defendant had shaved her "private parts."[3]  Around the same time, J.L. told her mother that defendant was "peeping" on her (i.e., looking at her through the window or while she was in the bathroom), touching her, and had "put" a vibrator on her.  In response, J.L.'s mother became "really mad" at defendant and they argued.  J.L., however, recanted; because she was afraid of the confrontation, she told her mother she had lied. When J.L. was 15 years old, she sent her mother a text message saying that she wanted defendant "gone" because he had "peep[ed]" on her in the bathtub, was trying to "make another deal with [her]," and had slapped her in the face two times.  J.L. indicated that she wanted her grandmother to be her guardian if mother stayed together with defendant. J.L. also threatened to "tell[] on [defendant]" (i.e., disclose the abuse).

Around the same time, J.L. told A.B. that she had lost her virginity, but not to her boyfriend.  Instead, J.L. pointed at defendant.  Thereafter, A.B. told her mother (i.e., defendant's sister) that J.L. had lost her virginity to defendant.[4]  Although A.B.'s mother

---

[3]  A.B. is approximately a year-and-a-half younger than J.L.  A.B. was 18 years old when she testified at trial.  A.B.'s mother is defendant's sister.  Thus, defendant is A.B.'s uncle.

[4]  When A.B. was asked about J.L.'s relationship with defendant, she explained that they argued "a lot," and that, at a "certain point," it appeared that they "were in a relationship" and "it was like husband and wife fighting constantly."  A.B. further explained that J.L. "always got what she wanted," and that defendant was always doing "favors" for her,

called Child Protective Services (CPS), A.B. never spoke with anyone from CPS about J.L.'s accusation against defendant.

Upon questioning "about the situation," J.L. told the police that A.B.'s mother had lied, explaining that defendant had not "done anything" to her or her siblings. At trial, J.L. noted that she did not disclose the sexual abuse at that time because she was scared of how it would affect her family.

When J.L. was 18 years old, her boyfriend (J.) took her to the police station after she disclosed that defendant had been raping her. The disclosure occurred after J. saw a Snapchat message on J.L.'s account while she was in the shower.[5] In that message, defendant said, "Let me see you," with an eyeball emoji, i.e., a picture of two eyes. When J. (posing as J.L.) asked defendant what he wanted to see, defendant indicated that he would "show" her if she let him take her away for an hour or two. J. responded by asking defendant whether it was "going to be naughty," to which defendant replied, "You know it."

At some point prior to the shower incident when J.L. was 18 or about to turn 18, she told her brother's girlfriend that defendant had done "[a] lot" of "inappropriate things" to her. While crying, J.L. explained that, in order to spend time with her boyfriend (J.), she had to do "inappropriate things" she did not "want to do," some of which occurred in hotel rooms.

At trial, J.L. explained that she would not have gone to the police station if J. had not found out about the sexual abuse.

---

which made her sisters jealous. A.B. also noted that J.L. and defendant would frequently "go places alone."

[5] At trial, J.L. explained that she would communicate with defendant using Snapchat, a social media application that allows users to send pictures and messages that disappear after a short period of time. J.L. further explained that J. had access to her Snapchat account.

*Defendant's Police Interview*

In May 2019, less than a week after J.L. went to the police station, defendant was interviewed by the police. Prior to his interview, defendant told his niece (A.B.) that he had been having an "inappropriate relationship with [J.L.] for the past few years," and that he was "going to get in trouble for it." Defendant explained that he had made a mistake "he wasn't going to be able to come back from." Defendant also told other family members that he had an "inappropriate relationship" with J.L.

During the police interview, defendant initially denied engaging in any sexual contact with J.L. However, after the detective indicated that the police had evidence demonstrating otherwise, defendant acknowledged that something had been going on between him and J.L. "for a year or two." When defendant was asked how it started, he responded, "I honestly don't even remember." Defendant gave the same answer when he was asked how many times he had sexual intercourse with J.L. When defendant was asked who initiated the intercourse, he said that he did not remember.

At one point during the interview, defendant admitted he had taught J.L. how to use a vibrator. Defendant also admitted to renting a hotel room for J.L. and A., but denied that he put a recording device in the room. He also denied that he saw a video of J.L. and A. engaging in sexual intercourse.

*J.L.'s Police Interview*

Five months later, in October 2019, J.L. was interviewed by the police. During the portion of her interview that was played for the jury, J.L. described how defendant pressured her into having sexual intercourse in exchange for renting a hotel room for her and A.

*Police Investigation*

A search of defendant's cell phone revealed that he had viewed teenage pornography and had searched the Internet for a "spy listening device." The search also revealed that, in September 2014 (when J.L. was 13 years old), defendant accessed a

8

document titled, "Unlawful Sexual Intercourse with a Minor, Criminal Statutes."
Additionally, in May 2019, shortly after J.L.'s disclosure of the sexual abuse to the police, defendant searched the Internet for information as to whether an attorney can subpoena phone records, whether a criminal case can be settled out of court, and what happens if an accuser does not show up to court. Finally, in addition to various photographs of unidentified teenage girls, defendant's phone also contained photographs of J.L. when she was 12, 13, and 14 years old, including a photograph of her while she was getting dressed (which was taken from outside her bedroom window), a photograph of her in a swimsuit on a diving board, and a close-up of the swimsuit photograph, which was cropped and zoomed in on her body.

During a search of the family home, the police found condoms, lubricant, and photographs of J.L. in a drawer in the garage.

Records from the relevant motels showed that defendant rented a room for one night on five separate occasions in 2016 and 2017 when J.L. was 15 and 16 years old, as well as a one-night stay in 2019 when J.L. was 17 years old.

*Expert Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS)*

Anthony Urquiza, a licensed psychologist with a Ph.D. in clinical psychology, qualified as an expert on the subject of sexually abused children and testified about CSAAS--a pattern of behaviors exhibited by children who have been sexually abused. Dr. Urquiza explained that CSAAS is not a diagnostic tool to determine whether sexual abuse has occurred, but rather an educational tool used to understand why children who have been sexually abused behave in a manner that appears to be inconsistent with being a victim of such abuse. For example, most children who are sexually abused by a family member significantly delay in reporting the abuse, and when they eventually disclose the abuse, they tend to give few details. If the response to the initial disclosure of the abuse is supportive, children tend to disclose more details because they feel safe. Relatedly, secrecy is also a component of CSAAS. Dr. Urquiza explained that most children are

9

sexually abused by someone with whom they have an ongoing relationship (e.g., a family member who is older, stronger, and in a position of control and authority), and that perpetrators of sexual abuse use intimidation and/or coercion to keep the abuse a secret. For example, children can be coerced by a threat of physical harm or a threat that something bad will happen if the abuse is disclosed. Children may also be coerced into keeping the abuse a secret because they receive special attention and/or gifts from the abuser.

Another component of CSAAS is that sexually abused children tend to feel helpless due to the inherent power differential between themselves and their adult abusers, especially if the abuser lives in the family home. And many sexually abused children feel trapped, ashamed, disgusted, and embarrassed, which causes them to suppress their feelings as a means of coping with the abuse. Finally, although not common, Dr. Urquiza noted that there are instances where children retract allegations of sexual abuse. He explained the best predictor of retraction is a situation where the child does not feel supported by their family (e.g., non-offending parent).

Dr. Urquiza made clear that he did not know the facts of this case and had never spoken with J.L. He explained that his testimony was about sexually abused children "as a class generally" and "not about this case particularly."

*Defendant's Trial Testimony*

Defendant testified on his own behalf at trial. His theory was that J.L. fabricated her claims of abuse because she was upset at him for the way he had treated her and her boyfriends.

Defendant repeatedly denied that he had sexual intercourse with J.L. or otherwise touched her in an inappropriate way. However, he admitted that, before he left the family home for his police interview in May 2019, he told J.L.'s mother and sisters that he had an "inappropriate relationship" with J.L., and that he had to "go to jail for a little while."

10

Shortly thereafter, he told his sister and niece (A.B.) that he had an "inappropriate relationship" with J.L. and was crying and upset.

Upon questioning at trial, defendant explained that he admitted to having an inappropriate relationship with J.L. during his police interview because J.L. refused to return home until he was arrested, and because J.L.'s mother was "freaking out" and threatened to take J.L.'s sisters and leave him if he did not make such an admission. When asked what he meant by inappropriate relationship, defendant explained that he let J.L. do inappropriate things and he talked to J.L. about "inappropriate stuff" and "racy topics," including "stuff about . . . intimate relationships." Defendant also claimed that he "just went with the question" when he indicated during his police interview that he had been having sex with J.L. for the past year or two. According to defendant, the only time he "didn't tell the truth" during his police interview was when he "admitted to having sex with [J.L.]." When asked, defendant explained that he did not deny having intercourse with J.L. because he "didn't know what was being said" by the interviewer, and that, "whatever it was, [he] was obviously going to take the blunt (*sic*) of [it] so [J.L.'s mother] could have nothing wrong, so nothing happened to [his] wife and kids." Defendant explained that he was worried that his wife would be arrested and his kids placed in foster care.

Defendant admitted that he threatened to stab J. on two separate occasions, he slapped J., he called J. a racial slur, and he harassed J. Defendant also admitted that he grabbed A.'s neck and that he rented a hotel room for J.L. and A.

When asked, defendant explained why he had certain photographs of J.L. in his phone and the Snapchat conversation that occurred while J.L. was in the shower. As to the latter, defendant claimed that he sent J.L. a message saying he wanted to "see" the house clean.

As for the motel records, defendant claimed he sold marijuana to people who would meet him at motels. He also claimed that he rented one room for his anniversary

11

with his wife, and that he set up a motion-sensitive camera in the motel rooms because a motel employee had stolen marijuana from him. However, he acknowledged that he never went to the relevant motel with his wife, and that the only images captured by the camera were of J.L., including J.L. having sex with A. Defendant claimed that he was truthful in his police interview when he denied ever seeing a video of J.L. and A. having sex because the camera only captured still images.

## DISCUSSION

### I

### *Alleged Instructional Errors*

Defendant raises several claims of instructional error, which we review de novo. (*People v. Parker* (2022) 13 Cal.5th 1, 66; *People v. Rivera* (2019) 7 Cal.5th 306, 326.) As we next explain, we see no basis for reversal.

A. *Lesser Included Offenses*

Defendant initially argues the trial court erred by failing to sua sponte instruct the jury on lesser included offenses as to the forcible sex offenses charged in counts 1 through 6, 8, and 10. He claims substantial evidence supported instructions on nonforcible sex offenses.

1. *Additional Background*

In counts 1 and 4, defendant was charged with aggravated (forcible) sexual assault of a child--rape of J.L. In counts 2 and 5, defendant was charged with aggravated (forcible) sexual assault of a child--oral copulation of J.L. In count 3, defendant was charged with aggravated (forcible) sexual assault of a child--sexual penetration of J.L. In counts 6, 8, and 10, defendant was charged with forcible oral copulation with a minor 14 years of age or older.

We refer to the foregoing offenses as "forcible" sex offenses, as a shorthand way of referring to the force element, which requires that the offenses be "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate

12

and unlawful bodily injury on the person or another." (See §§ 261, subd. (a)(2) [rape], 287, subd. (c)(2) [oral copulation], 289, subd. (a)(1) [sexual penetration].) During closing argument, the prosecutor focused on the element of duress with respect to the aggravated/forcible component of the charged sex offenses.

The accusatory pleading alleged that J.L. was 12 years old with respect to counts 1, 2, and 3, 13 years old with respect to counts 4 and 5, 14 years old with respect to count 6, 15 years old with respect to count 8, and 16 years old with respect to count 10. The accusatory pleading also alleged that, with respect to counts 1 through 5, J.L. was under the age of 14 years and defendant was more than seven years older than her.

2. *Applicable Legal Principles*

a. *Aggravated/Forcible Component*

As relevant here, an act is accomplished by "force" if a person uses enough physical force to overcome the other person's will. (See *People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024, 1027 [explaining that " ' " '[t]he kind of physical force [used] is immaterial,' " ' " and "conduct which might normally attend sexual intercourse . . . can support a forcible rape conviction"]; CALCRIM No. 1000 (Rape by Force, Fear, or Threats); CALCRIM No. 1015 (Oral Copulation by Force, Fear, or Threats); CALCRIM No. 1045 (Sexual Penetration by Force, Fear, or Threats).) " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude. [Citation.] It also includes the force used to accomplish 'the penetration and the physical movement and positioning of [the victim's] body in accomplishing the act.' " (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.) The question for the jury is whether the defendant used force to accomplish the sexual acts against the victim's will, "not whether the force he used overcame [the victim's] physical strength or ability to resist him." (*Griffin*, at p. 1028.)

Further, for purposes of the relevant charged sex offenses, "duress" means " 'a direct or implied threat of force, violence, danger, . . . or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004; see CALCRIM Nos. 1000, 1015, and 1045.)[6]  The jury determines duress by considering the totality of the circumstances.  (*People v. Veale* (2008) 160 Cal.App.4th 40, 46; § 261, subd. (b)(1); CALCRIM Nos. 1000, 1015, 1045.)  Relevant factors include the age of the victim, their relationship to the defendant, relative size and age disparities, location of the sexual abuse, the position of dominance and authority of the defendant, and past and present conduct of the defendant toward the victim, including defendant's continuous exploitations of the victim and whether the defendant made threats of harm to the victim or physically controlled the victim when the victim attempted to resist.  (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13-14, disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12; *People v. Cardenas* (1994) 21 Cal.App.4th 927, 940; *People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 238-239; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51, disapproved on other grounds in *Soto*, at p. 248, fn. 12.)  "The very nature of duress is psychological coercion."  (*Cochran*, at p. 15.)

"The fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress.  [Citation.]  When the victim is young and is molested

---

[6] We recognize that, in contrast to forcible rape, duress for purposes of forcible oral copulation and forcible sexual penetration also includes a direct or implied threat of *hardship*.  (Compare CALCRIM No. 1000 with CALCRIM Nos. 1015 and 1045; see *People v. Leal, supra*, 33 Cal.4th at p. 1007 [the deletion of the term "hardship" from the definition of "duress" applies only to the rape and spousal rape statutes].)  This distinction is immaterial to the resolution of the issues raised on appeal.

by her father in the family home, duress will be present in all but the rarest cases."
(*People v. Thomas*, *supra*, 15 Cal.App.5th at pp. 1072-1073.)

### b. *Lesser Included Offenses*

" ' " '[I]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 477.)

An offense is necessarily included in another if the greater crime cannot be committed without also committing the lesser crime. (*People v. Hughes* (2002) 27 Cal.4th 287, 365-366.) Courts have "applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser

15

offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.)

In determining whether the trial court improperly failed to instruct on a lesser included offense, we consider the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

### 3. *Analysis*

We conclude the trial court did not err by failing to instruct the jury sua sponte on lesser included nonforcible sex offenses (e.g., nonforcible oral copulation). As we shall explain, even assuming (without deciding) the nonforcible sex offenses identified by defendant are lesser included offenses of the charged offenses (see *People v. Woods* (2015) 241 Cal.App.4th 461, 475 [accepting the People's concession that nonforcible oral copulation of a person under 18 years of age is a lesser included offense of forcible oral copulation of a minor 14 years of age or older]), we agree with the People that there was no substantial evidence to warrant instructions on these offenses.

In support of his position, defendant argues J.L. did not testify that he used force or duress to accomplish the charged sexual acts that occurred when she was 12 and 13 years old. Defendant further argues J.L. did not specifically describe the use of force or duress as to the oral copulation that occurred after she turned 14 years old. Instead, J.L. discussed two specific incidents involving force or duress but neither involved oral copulation, and she gave general testimony that, if she refused to engage in sexual acts, defendant would yell at her mother and siblings. According to defendant, the lack of evidence as to the aggravated/forcible component was a sufficient basis to warrant instructions on lesser included nonforcible sex offenses. We disagree, because the record does not contain substantial evidence showing that the charged sex offenses were *not* accomplished by force and/or duress.

As we have described, J.L. unequivocally testified that she neither consented to nor willingly engaged in *any* sexual act with defendant, and that the acts began in the

16

family home when she was 11 or 12 years old and continued regularly until she turned 18. J.L. explained that, beginning in the summer before she started sixth grade, defendant came into her room at night on a regular basis while she was in bed, undressed her, and moved her around so he could orally copulate her and/or touch her vagina, including the inside, with his finger. J.L. further testified that defendant had sexual intercourse with her frequently when she was between the ages of 12 and 14. She explained that, beginning in sixth grade when she was 12 years old, defendant came into her room at night, pulled her pants down, and moved her body (including to the floor) so he could have sexual intercourse with her, and that there was never a year from when she was 12 years old until she was 18 years old that defendant did not orally copulate her. J.L. noted that she submitted to the sexual acts because she felt like she had no choice and it was a normal part of her life; she felt frustrated, helpless, and trapped. She further noted that defendant made the family rules and was the disciplinarian, and that if she refused his sexual demands, he would be on edge and irritated the entire day; he would create a "whole bunch of chaos and havoc" in the house and yell at everyone. Defendant's conduct made J.L. feel like it was her fault that defendant yelled at her mother and/or sisters. When asked, J.L. described an incident where defendant forced himself onto her when she refused to engage in sexual acts with him, and a separate incident where he got really mad and swore at her when she told him, "no," which made her "pretty terrified." There was also evidence that defendant would refuse to do things for J.L. (e.g., pay her phone bill, give her permission to do things, drive her places) if she did not engage in sexual acts with him (e.g., go for a car ride to an empty parking lot to have sexual intercourse). Defendant, for his part, denied that he had ever touched J.L. inappropriately, including all sexual abuse allegations. During closing argument, defense counsel argued as much. The defense theory was that J.L. fabricated the allegations of abuse because she was upset at defendant because of the way he had treated her and her boyfriends.

17

On this record, we see no instructional error. There was no evidence establishing J.L.'s positive cooperation in act or attitude that would have allowed a reasonable jury to conclude that defendant committed *nonforcible but not forcible* sex offenses. (Cf. *People v. Woods*, *supra*, 241 Cal.App.4th at p. 476 [finding sufficient evidence to warrant an instruction on nonforcible oral copulation where, among other things, there was evidence that the female victim regarded the defendant as her boyfriend, she did not say "no" to him or ask him to stop, she initiated some of the sexual conduct and found the sex to be fun, and told others she loved him and was in a consensual sexual relationship with him].) Here, the evidence was such that if defendant did commit the charged acts, he accomplished them by force and/or duress.

Finally, even if we assume instructional error, we see no prejudice. In a noncapital case, when a trial court fails to instruct on a lesser included offense, reversal is not required unless there is a reasonable probability that the defendant would have obtained a more favorable outcome had the instruction been given. (*People v. Rogers* (2006) 39 Cal.4th 826, 867-868; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196, 198-199.) In short, because there was overwhelming evidence (as detailed *ante*) that defendant committed the charged offenses against J.L. by force and/or duress and no evidence supporting a contrary conclusion, we are convinced that it is not reasonably probable defendant would have obtained a more favorable outcome absent the asserted instructional error.

B. *CALCRIM No. 362 (Consciousness of Guilt: False Statements)*

Next, defendant argues the trial court erred in instructing the jury with the following pattern instruction on false statements:

"If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. If you conclude that the defendant made the statement, it is up to you to decide

18

its meaning and importance.  However, evidence that the defendant made such a statement cannot prove guilt by itself.”

Defendant does *not* argue the instruction lacked evidentiary support.[7]  Rather, he claims the instruction was erroneously given because it is argumentative in favor of the prosecution, it allowed the jury to make an irrational inference of guilt, and its language presumed defendant's guilt, thereby reducing the prosecution's burden of proof in violation of his constitutional rights.  We are unpersuaded.

Our Supreme Court has repeatedly approved consciousness of guilt instructions. (See, e.g., *People v. Moore* (2011) 51 Cal.4th 386, 413-414 [approving CALJIC No. 2.03, the predecessor to CALCRIM No. 362]; *People v. Howard* (2008) 42 Cal.4th 1000, 1020-1021.)  And a panel from this court recently rejected a claim that CALCRIM No. 362 is "infirm."  (See *People v. Burton* (2018) 29 Cal.App.5th 917, 923-926.)  In so doing, the *Burton* court explained:  "CALCRIM No. 362 *limits* the reach of any adverse inference both by telling the jury that it decides the 'meaning and importance' of the evidence and by telling the jury the making of a willfully false statement 'cannot prove guilt by itself.'  [Citation.]  CALCRIM No. 362, like CALJIC No. 2.03 before it, is designed to benefit the defense, ' "admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory."  [Citation.]' [Citation.]  And because the evidence cannot prove guilt by itself, a jury would understand that the consciousness of guilt—however deep it ran—was not the equivalent of a confession.  [Citation.]  Thus, a jury would understand both that false statements were not the equivalent of a confession and that they were not themselves sufficient to prove guilt of the charged crimes.  'The trial court properly left it for the jury to

---

[7] In his opening brief, defendant concedes he made a false statement during his police interview about his relationship with J.L.

determine whether defendant's statement to police was false or deliberately misleading, and if so, what weight should be given to that evidence.' " (*Burton*, at p. 925.)

We find no merit in defendant's contention that CALCRIM No. 362 improperly presumes guilt because it asks the jury to determine whether the defendant was "aware" of his guilt, and a defendant cannot be "aware of his guilt unless he was in fact guilty." A similar argument concerning CALCRIM No. 372 (Flight) was rejected in *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1158-1159.[8] (See also *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 500-502 [adopting the reasoning of *Hernández Ríos* (and other cases) in rejecting due process claim asserting that CALCRIM No. 372 " 'reliev[ed] the state of proving every element of the charged crime[s] beyond a reasonable doubt' "].) We find the reasoning in *Hernández Ríos* persuasive and follow it here.

## C. *CALCRIM No. 1193 (Testimony on CSAAS)*

Finally, defendant argues the trial court erred by instructing the jury with the following pattern instruction on CSAAS: "You have heard testimony from Dr. Urquiza regarding child sexual abuse accommodation syndrome. Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not [J.]L.'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

---

[8] The challenged flight instruction in *Hernández Ríos* stated as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was *aware of his guilt*. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." (*People v. Hernández Ríos, supra,* 151 Cal.App.4th at p. 1158.)

20

Defendant claims the instruction was erroneous because it violated his due process rights by allowing the jury to consider CSAAS testimony for the improper purpose of determining whether J.L. "was telling the truth and hence whether [he] was guilty."[9] Although defendant recognizes that appellate courts have held that CALCRIM No. 1193 is a "correct instruction," he insists that those cases were wrongly decided. We are unpersuaded. We agree with the reasoning of the cases upholding the instruction and adopt it here. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175, *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 504.) Accordingly, we find no instructional error.[10]

II

*Alleged Sentencing Errors*

Defendant raises two claims of sentencing error, which we address in turn below.

A. *Senate Bill No. 567*

Defendant initially argues reversal is required because the trial court imposed upper term sentences on counts 6 through 15 without the benefit of Senate Bill No. 567. He claims Senate Bill No. 567 applies retroactively, and the proper remedy is to vacate sentence and remand for resentencing. The People agree with the first claim but argue remand is unnecessary because any sentencing error was harmless. We agree that Senate Bill No. 567 applies retroactively to defendant's nonfinal judgment (*People v. Zabelle*

---

[9] CSAAS expert testimony is not admissible to prove the complaining witness has in fact been sexually abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) It is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident (e.g., delay in reporting) is inconsistent with her testimony claiming molestation. (*Ibid*.) Such testimony is needed to disabuse jurors of commonly held misconceptions of child sexual abuse and the abused child's seemingly self-impeaching behavior. (*Id*. at p. 1301.)

[10] Because we have addressed defendant's claims of instructional error on the merits, we need not and do not consider the People's forfeiture arguments.

(2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*)) and will remand for a full resentencing.

When defendant was originally sentenced in August 2021, section 1170, subdivision (b) provided that when a judgment of imprisonment is to be imposed and the statute authorizes three potential terms, "the choice of the appropriate term shall rest within the sound discretion of the court." (§ 1170, former subd. (b); Stats. 2020, ch. 29, § 14.) Thus, at the time of sentencing, the trial court had broad discretion to select the term--lower, middle, or upper--from the applicable triad. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464.) Effective January 1, 2022, Senate Bill No. 567 changed the requirements for proving aggravating circumstances and altered sentencing discretion under section 1170. (Stats. 2021, ch. 731, § 1.3.)

Under the newly amended version of section 1170, when a judgment of imprisonment is to be imposed and a statute specifies three possible terms, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in [section 1170, subdivision (b)(2)]." (§ 1170, subd. (b)(1).) Section 1170, subdivision (b)(2) provides that the trial court may impose a sentence exceeding the middle term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." One exception is that the court may rely on a certified record of conviction to find a prior conviction proven. (§ 1170, subd. (b)(3).)

Here, in imposing upper term sentences on counts 6 through 15, which involved forcible oral copulation and forcible rape when J.L. was between the ages of 14 and 17, the trial court did not find any factors in mitigation and cited multiple aggravating factors: (1) "the crimes involved acts disclosing a high degree of cruelty, viciousness, and callousness"; (2) the victim was "particularly vulnerable"; (3) "[t]he manner in which the crimes were committed indicated planning, sophistication, or professionalism"; (4)

22

defendant had served a prior prison term; and (5) defendant's performance on probation was unsatisfactory. (See Cal. Rules of Court, rule 4.421(a), (b).)[11] None of these factors were proven as now required under the amended statute, and the court provided no explanation as to the respective weight it was according any of the aggravating factors. Nor did the court elaborate on its decision to impose upper term sentences. Nothing in the appellate record discloses that the records of conviction were certified and the People do not argue as much on appeal. Further, none of the other aggravating factors were proven in the manner required under the new sentencing law, as amended by Senate Bill No. 567. (See § 1170, subd. (b).) Prior to imposing sentence, the court stated that it intended to follow the recommendation set forth in the probation report, which it ultimately did. The court did not address defendant's objection to the probation report on the ground it contained "a bunch of hearsay" that did not include anything "factual from trial."

It is undisputed that the trial court did not have the benefit of the amendments to section 1170 when it sentenced defendant. However, "before finding remand appropriate, [we] must first subject the trial court's error to harmless error review." (*Zabelle, supra*, 80 Cal.App.5th at p. 1110.) On the record before us, we conclude remand for resentencing is required. Even assuming the denial of defendant's right to a jury trial on the aggravating circumstances was harmless under the Sixth Amendment analysis articulated in *Zabelle* because it was undisputed defendant had served a prior prison term (rule 4.421(b)(3)), we cannot reach the same conclusion with respect to the remaining aggravating circumstances articulated by the court. Where, as here, an aggravating circumstance rests on a somewhat vague or subjective standard (e.g., the crimes involved acts disclosing a high degree of cruelty, viciousness, and callousness

---

[11] Further rule references are to the California Rules of Court.

(rule 4.421(a)(1)), the victim was particularly vulnerable (rule 4.421(a)(3)), the manner in which the crimes were carried out indicates planning, sophistication, or professionalism (rule 4.421(a)(8)), "it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840; see *People v. Lincoln* (2007) 157 Cal.App.4th 196, 204 ["making assessments of what a jury would have decided with respect to 'somewhat vague or subjective standard[s]' is a thorny task"].) As we have noted, defendant's objections to the contents of the probation report went unaddressed. Further, the record reflects that the court relied on the unproven allegations in the probation report for its finding concerning defendant's unsatisfactory performance on probation. As the *Zabelle* court explained, "If the record is insufficient to support a trial court's findings about a defendant's criminal history, we will not presume the existence of extrarecord materials, however likely they are to exist, to address this insufficiency." (*Zabelle, supra*, 80 Cal.App.5th at p. 1115, fn. 6.)

Under the circumstances presented, where *none* of the aggravating circumstances were proven as is now required by the amended statute, we will vacate the sentence and remand for the trial court to resentence defendant in a manner consistent with the amended version of section 1170, subdivision (b). (See *People v. Avalos*, *supra*, 37 Cal.3d at p. 233 [reviewing court "must . . . reverse where it cannot determine whether the improper factor was determinative for the sentencing court"].) The court is directed to conduct a full resentencing, including all applicable retroactive changes in the law. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425; *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

B. *Victim Restitution*

Because we are vacating sentence and remanding for a full resentencing, we need not and do not consider defendant's contention that the trial court erred in awarding J.L.

$300,000 in victim restitution for noneconomic losses under section 1202.4, subdivision (f)(3)(F).

## DISPOSITION

The sentence is vacated and the matter is remanded for a full resentencing, applying section 1170 as amended by Senate Bill No. 567 and all other applicable retroactive changes in the law.  In all other respects, the judgment is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Hull, Acting P. J.

_____/s/_____
Keithley, J.*

---

*Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.